# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Troy Ugrich,  Civil No. 16-1008 (DWF/LIB)

      Plaintiff,

v. **MEMORANDUM OPINION AND ORDER**

Itasca County, Minnesota; Victor J.
Williams (in his individual and official
capacity); Denise Hirt (in her individual
and official capacity); and Albert Morse (in
his individual and official capacity),

      Defendants.

---

Kyle E. Hart, Esq., and Nathan R. Sellers, Esq., Fabyanske Westra Hart & Thomson, PA, counsel for Plaintiff.

Jessica E. Schwie, Esq., Tal Aaron Bakke, Esq., and Tessa M McEllistrem, Esq., Jardine Logan & O'Brien PLLP, counsel for Defendants.

---

## INTRODUCTION

The plaintiff in this case was a sheriff's deputy who resigned in early 2016 after being placed on administrative leave pending an investigation into whether he lent his squad car to be filmed in a movie against a direct order from his supervisor. The plaintiff filed suit alleging that Defendants retaliated against him for supporting a challenger sheriff candidate in 2014 and for reporting possible violations to a state oversight agency. The defendants moved for summary judgment. For the reasons discussed below, the Court grants the defendants' motion.

## BACKGROUND

In March 1997, Plaintiff Troy Ugrich joined the Itasca County Sheriff's Department ("Sheriff's Department") as a sheriff's deputy. In November 2010, Defendant Victor Williams was first elected sheriff. The other three defendants in this case are Itasca County, Chief Deputy Denise Hirt, and Supervisor Albert Morse. In 2014, Ugrich backed a challenger candidate for sheriff, Deputy Bryan Johnson. Ugrich served as Johnson's campaign manager. In his role as campaign manager, Ugrich contends that he made a number of critical statements regarding Williams and the Sheriff's Department. Specifically, Ugrich alleges that he published criticism about the Sheriff Department's budget at the Itasca County Fair and on Facebook. In addition, Ugrich helped write a letter to the Grand Rapids Herald Review on behalf of the Johnson Campaign claiming that the Sheriff's Department was allowing employees to use county-issued credit cards to pay for gasoline consumed for personal use ("Herald Letter"). (Schwie Decl., Ex. 30.) In the end, Williams was re-elected.

During and after the election, Ugrich claims that Defendants retaliated against him for his role in the Johnson campaign. Ugrich first claims that Defendants retaliated against him by excluding him from the execution of a search warrant. On June 26, 2014, a few days after the Johnson campaign published its criticism of the Sheriff's Department's budget, officers from the Sheriff's Department participated in the execution of a search warrant on a house in Taconite, Minnesota, as part of a multijurisdictional drug operation. Around this same time in Taconite, Ugrich was attempting to serve civil process papers for an unrelated matter. Ugrich claims that he was purposely not

informed about the search being executed nearby and felt that he was unnecessarily placed in danger. Ugrich and his wife each tried to raise the issue with Williams, but Williams apparently refused to speak with either of them. Ugrich claims that he suffered emotional distress as a result of the incident and no longer feels safe working for the Sheriff's Department.

Next, Ugrich contends that he was retaliated against in the form of two unwarranted verbal reprimands. The first reprimand (in October 2014) was the result of Ugrich refusing to respond to a possible emergency situation involving a suicidal person because Ugrich was escorting someone to retrieve property. (T. Ugrich Dep. at 209.)[1] The reprimand was for failing to prioritize the more serious situation. (Morse Dep. at 79-81.) Ugrich's second reprimand (in September 2015) was for failing to show for his scheduled shift. Ugrich filed a grievance over the second reprimand, and it was removed from his record. Defendants concede that, with minor exception, Ugrich had performed his job satisfactorily. (Defs.' Memo. at 2.)

Last, Ugrich alleges that Defendants retaliated against him by suspending him pending an investigation into whether he lent his squad car to movie producers. In August 2014, a movie-production manager contacted Chief Deputy Hirt requesting permission to use one of the Sheriff Department's squad cars in a movie. Hirt told the production manager that the Sheriff Department could not lend the squad car due to

---

[1] The Court cites to the depositions, all of which are exhibits to the Schwie Declaration, by the name of the deponent, e.g., "T. Ugrich Dep." or "Hirt Dep." The Court also cites to Defendants' Memorandum in Support of Summary Judgment as "Defs.' Memo." (Doc. No. 69); Plaintiff's Opposition as "Pl.'s Opp." (Doc. No. 70); and Defendants' Reply as "Defs.' Reply." (Doc. No. 76.)

3

possible liability issues. (Hirt at 75; *see also* Schwie Decl., Ex. 54 ("Admin. Investigation Final Report") at 2.) Then, later in August 2014, Ugrich called Hirt requesting permission to use his squad car in the movie. Hirt again said no. (Hirt Dep. at 75; Admin. Investigation Final Report at 2.) Over a year later, in late August 2015, Williams and Hirt learned that a Sheriff's Department squad car was used in filming the movie. On September 22, 2015, Ugrich was placed on administrative leave pending further investigation. This suspension came on the heels of Ugrich filing a formal complaint with the Minnesota Board of Peace Officer Standards and Training ("Post Board") regarding the Sheriff's Department's rules for part-time officers.

The investigation into Ugrich's misconduct contained two components: an administrative and a criminal investigation. The criminal investigation was referred to Crow Wing County. (Hirt Dep. at 19.) Crow Wing County has not recommended any criminal charges, but the investigation has not yet been closed. (*Id.* at 25.) For the administrative investigation, Itasca County hired Attorney Frank J. Madden to perform an internal investigation. (Williams Dep. at 124.) Despite repeated requests, Ugrich refused to be interviewed for the investigation.[2] Instead, on January 25, 2016, Ugrich resigned, claiming that he had been constructively discharged. (Doc. No. 71 ("Ugrich Aff.") ¶ 16, Ex. B.)

---

[2] During his deposition, Ugrich invoked his Fifth Amendment rights and refused to answer questions regarding whether he lent his squad car to the movie. Ugrich later filed an affidavit confirming that he lent his squad car. (Doc. No. 71). Regardless, the undisputed facts in this case are that Hirt directed Ugrich not to lend his squad car to the movie.

4

Ugrich filed his complaint on April 18, 2016, alleging that Defendants: (1) violated his First Amendment rights by retaliating against him for supporting a challenger candidate for sheriff; (2) violated his right to equal protection under the 14th Amendment by treating him differently than other deputies who exercised their free-speech rights; and (3) retaliated against him in violation the Minnesota Whistleblower Act, Minnesota Statute §§ 181.931-.932. Defendants now move for summary judgment.

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must view the evidence, and the inferences that may be reasonably drawn from the evidence, in the light most favorable to the nonmoving party. *Weitz Co., LLC v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009). However, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. Cty.*

5

*of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II. First Amendment Claim

Ugrich has brought a claim under 42 U.S.C. § 1983 contending that Defendants retaliated against him because he exercised his First Amendment rights in supporting a challenger sheriff candidate. "A plaintiff alleging First Amendment retaliation must first make a prima facie showing that (1) [he] engaged in conduct protected by the First Amendment; (2) [he] suffered an adverse employment action; and (3) the protected activity was a substantial or motivating factor in the employer's decision to take the adverse employment action." *Wagner v. Jones*, 664 F.3d 259, 270 (8th Cir. 2011). Once the plaintiff makes his prima facie showing, "a presumption of retaliation arises and the burden shifts to the defendant to advance a legitimate reason for the employment action." *Id.* This standard differs from the often-used *McDonnell-Douglas* burden-shifting analysis, in that, "'once the burden of persuasion shifts to the defendant-employer, the plaintiff-employee will prevail unless the fact finder concludes that the defendant has produced enough evidence to establish that the plaintiff's dismissal would have occurred in any event for nondiscriminatory reasons.'" *Id.* (quoting *Acevedo–Diaz v. Aponte*, 1 F.3d 62, 67 (1st Cir. 1993)).

Here, the parties focus on: (1) whether Ugrich suffered an adverse employment action; and (2) whether Ugrich has shown protected conduct was a substantial or

motivating factor.  (*See* Defs.' Memo. at 16 n.8.)[3]  "An adverse employment action is defined as a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge." *Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013).  Here, Ugrich identifies three different instances of adverse employment action.  First, Ugrich contends that he suffered adverse action when he was placed on administrative leave and investigated for lending his squad car to movie producers.  By being placed on leave, Ugrich lost out on overtime and shift-differential wages.  Second, Ugrich argues that he suffered adverse action in the form of two unwarranted reprimands.  Last, Ugrich contends that he was constructively discharged.

First, the Court concludes that Ugrich did not suffer an adverse employment action by being placed on administrative leave and therefore missing out on additional pay.  To start, being placed on administrative leave with pay pending an investigation is not an adverse action.  *Singletary v. Missouri Dep't of Corr.*, 423 F.3d 886, 892 (8th Cir. 2005).  Ugrich contends that his position is different than other suspended-with-pay cases

---

[3]  Because the Court resolves this case on the issue of adverse action, the Court does not reach the issue of whether Ugrich's role in the campaign was a motivating factor in any adverse employment action.  If the Court were to reach the issue, it would conclude that issues of fact exist precluding summary judgment.  In addition, the Court did not reach the issue of whether a legitimate reason existed for the adverse action.  But if the Court were to consider the issue, it would conclude that a legitimate reason existed to discharge Ugrich because he lent his squad car to the movie producers after his supervisor (Hirt) directed him not to lend the car.

because he lost out on overtime and shift-differential pay. But the loss of extra pay due to a suspension pending an investigation does not constitute adverse action. *See Brown v. City of Syracuse*, 677 F. Supp. 2d 576, 579 (N.D.N.Y. 2010) (concluding that losing overtime opportunity while suspended during an investigation was not an adverse employment action), *aff'd*, 673 F.3d 141 (2d Cir. 2012). Thus, Ugrich cannot establish a prima facie case of retaliation based on is suspension because the suspension with pay was not an adverse employment action.[4]

Second, the Court concludes that Ugrich's two verbal reprimands do not constitute adverse employment action. Plaintiff cites *Kim v. Nash Finch Co.*, 123 F.3d 1046 (8th Cir. 1997) for the proposition that performance reviews can constitute adverse employment action. But in *Kim*, the plaintiff's duties had been reduced, he was receiving negative reviews, and he was forced to undergo remedial training. *Id.* at 1060. Moreover, there was evidence that Nash Finch was "papering" the plaintiff's employment record with negative reports and written reprimands to justify the retaliation. *See id* at 1060-61. Here, in contrast, Ugrich received two verbal reprimands, one of which was removed through the grievance process. Ugrich cannot establish the systematic

---

[4] Defendant cites to *Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 633 (8th Cir. 2016) for the proposition that a reduction in pay, no matter how small, may constitute adverse action. But *Kelleher* is inapposite. To start, the plaintiff in *Kelleher* was not placed on leave pending an investigation. *Brown v. City of Syracuse*, 673 F.3d 141, 151 (2d Cir. 2012) (noting the absurdity of creating an exception for overtime to the general rule that an employee has not suffered an adverse action when he is suspended with pay pending an investigation). But even so, the Eighth Circuit ultimately just assumed that the plaintiff established a prima facie case of retaliation because she could not show that the employer's reason for the adverse action was merely a pretext to retaliate for protected conduct. Thus, *Kelleher* has little to do with the facts here.

retaliation identified in *Kim* by pointing to one verbal reprimand. *See Jackman*, 728 F.3d at 805 (noting the "particularly extreme set of facts" in *Kim*). Thus, Ugrich did not suffer an adverse employment action as a result of his verbal reprimand in October 2014.

Last, the Court concludes that Ugrich was not constructively discharged. Ugrich contends that he was constructively discharged because he was excluded from the search warrant in Taconite in June 2014. As a result, Ugrich felt that he could not trust Defendants. Constructive discharge occurs when "an employee had no choice but to quit because of the employer's actions." *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 717 (8th Cir. 2003) (citations omitted). This is because the decision to leave is not viewed as truly voluntary. *Id.* Courts apply an objective standard to determine whether an employee was constructively discharged because he found his working conditions intolerable. *West v. Marion Merrell Dow, Inc.,* 54 F.3d 493, 497 (8th Cir. 1995). The employer must deliberately create the intolerable working conditions for the purpose of forcing the employee to quit his job. *Bradford v. Norfolk Southern Corp.*, 54 F.3d 1412, 1420 (8th Cir. 1995). If an employee quits without giving his employer a reasonable chance to resolve the problem, then the employee is not constructively discharged. *West,* 54 F.3d at 498.

Here, Ugrich points to one incident, 18 months before he resigned, as the basis for constructive discharge. But constructive discharge generally requires more than a single instance and some temporal proximity between the wrongful conduct and the resignation. *Cf. Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1185 (9th Cir. 2005) (noting that the plaintiff's claim for constructive discharge failed because three-to-four months had

9

passed since the wrongful conduct ended); *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir. 1987) ("[I]n general, a 'single isolated instance' of employment discrimination is insufficient as a matter of law to support a finding of constructive discharge."). Moreover, the record demonstrates that Ugrich resigned as a result of the pending investigation into him lending his car to a movie producer against the direction of Chief Deputy Hirt. *Jones v. Fitzgerald*, 285 F.3d 705, 716 (8th Cir. 2002) (concluding that the resignation was not because of a hostile work environment but because of the plaintiff's own wrongful conduct). Thus, the Court concludes that Ugrich has failed to show he suffered an adverse employment action. The Court therefore dismisses Plaintiff's § 1983 claim to the extent that it is brought based on First Amendment retaliation.

### III.     Fourteenth Amendment Claim

Plaintiff also brought a § 1983 claim against Defendants contending that his right to equal protection under the Fourteenth Amendment was violated because Defendants treated Ugrich differently than other officers who exercised their free-speech rights. Ugrich's claim, however, is just a repackaged version of his First Amendment claim. Such a claim does not implicate the Equal Protection Clause of the Fourteenth Amendment. *See Burton v. Arkansas Sec'y of State*, 737 F.3d 1219, 1236 & n.7 (8th Cir. 2013) (collecting cases). Ugrich did not even respond to Defendants' argument that the claim was not cognizable. Thus, the Court grants Defendants' motion to the extent that it seeks to dismiss Plaintiff's Fourteenth Amendment claim.

## IV. Minnesota Whistleblower Claim

Plaintiff also brought a whistleblower claim against Defendants contending that he was retaliated against for: (1) the Herald Letter, which identified allegedly unlawful use of county-issued credit cards; and (2) Ugrich's complaint to the POST Board regarding the rules for part-time officers. The Minnesota Whistleblower Act ("MWA") prohibits retaliation by an employer when, among other things, an employee, "in good faith, reports a violation, suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official." Minn. Stat. § 181.932, subd. 1(1). Courts interpret MWA claims narrowly. *Pedersen v. Bio-Med. Applications of Minn.*, 992 F. Supp. 2d 934, 941 (D. Minn. 2014), *aff'd*, 775 F.3d 1049 (8th Cir. 2015). An MWA claim can be shown through either direct evidence of retaliatory animus or through the *McDonnell-Douglas* burden-shifting framework. *Wood v. SatCom Mktg., LLC*, 705 F.3d 823, 828 (8th Cir. 2013).

Ugrich does not contend that he has direct evidence of retaliation. Instead, Ugrich relies on the *McDonnell-Douglas* burden-shifting framework. Under this framework, the initial burden is on the plaintiff to establish a prima facie case, consisting of evidence that: (1) he engaged in statutorily protected activity; (2) an adverse employment action was taken; and (3) a causal connection exists between the two events. *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 914 (8th Cir. 2006). If the plaintiff establishes a prima facie case, then the burden shifts to the employer to show a non-retaliatory reason for the adverse employment action, at which point the burden returns to the plaintiff who

11

must present evidence that creates both: (1) a question of fact as to whether the employer's reason was pretextual; and (2) a reasonable inference that the employer acted in retaliation. *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 880 (8th Cir. 2005).

Here, as explained above, Ugrich did not suffer an adverse employment action. Thus, his MWA claim likewise fails. But even if Ugrich suffered an adverse employment action, Ugrich's claim still fails because either: (1) he did not engage in protected conduct; or (2) he cannot show a causal connection between any adverse action and the protected conduct.

### A. Protected Conduct

An employee engages in conduct protected by the MWA when he, in good faith, "reports a violation, suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official." Minn. Stat. § 181.932 subd. 1(1). Good faith under the statute requires only that the report was not made in knowing or reckless disregard of the truth. *Friedlander v. Edwards Lifescis., LLC*, 900 N.W.2d 162, 166 (Minn. 2017). Here, Defendants concede that Plaintiff's POST Complaint was a report under the MWA. (*See* Defs.' Memo. at 7.) The Court concludes, however, that the Herald Letter does not constitute a report because it was not made to "an employer or to any governmental body or law enforcement official." *See* Minn. Stat. § 181.932, subd. 1(1). In his opposition, Ugrich did not even address Plaintiff's arguments regarding the MWA claim. Thus, the Court concludes that, for this separate reason, Plaintiff's MWA claim for the Herald Letter fails.

B.  **Causal Connection**

Even if the Plaintiff could show that he made reports and suffered adverse employment action, Plaintiff's MWA claim fails because he cannot show a causal connection. First, the Herald Letter published in mid-2014 is too far removed to raise the inference of retaliation. *Noyes v. Am. Tissue Servs. Found.*, 310 F. App'x 52, 53 (8th Cir. 2009) (affirming the district court's conclusion that a causal connection cannot be inferred when four-to-five months separated the protected conduct and the adverse action). Similarly, Plaintiff cannot show that anyone at the Sheriff's Department even knew a complaint had been made to the POST Board. (Raquet Dep. at 9-11.) Thus, Plaintiff has failed to show a causal connection between any report and any adverse action. Ugrich did not even respond to Defendants' arguments on causal connection. Thus, the Court concludes that Plaintiff's MWA claim fails.

## ORDER

Based upon the foregoing, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. [65]) is **GRANTED**. Plaintiff's Complaint (Doc. No. [1]) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  October 6, 2017          s/Donovan W. Frank
                                 DONOVAN W. FRANK
                                 United States District Judge